**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION**

| | |
|---|---|
| FAWN CAIN, TANYA ARCHER, and SANDI OVITT, <br><br> Plaintiffs, <br><br> vs. <br><br> SALISH KOOTENAI COLLEGE, INC., et al., <br><br> Defendants. | CV-12-181-M-BMM <br><br> **MEMORANDUM AND ORDER** |

## BACKGROUND

The Ninth Circuit issued its opinion in this matter on July 10, 2017. *United States ex rel. Cain v. Salish Kootenai College, Inc.*, 862 F.3d 939 (9th Cir. 2017). The Ninth Circuit instructed this Court to determine on remand whether Defendant Salish Kootenai College, Inc. (the College) functions as an arm of the Confederated Salish and Kootenai Tribes (the Tribe) "and therefore shares the Tribe's sovereign status" for purpose of the False Claims Act, 31 U.S.C. §§ 3729-3733. *Cain*, 862 F.3d at 943.

The Ninth Circuit directed this Court to determine the College's status by analyzing the relationship between the College and the Tribe using the factors described in *White v. University of California*, 765 F.3d 1010 (9th Cir. 2014). *Id.* at

945. The parties have conducted discovery on the relationship between the College and the Tribe. The College has filed a Renewed Motion to Dismiss. (Doc. 91). The College argues that Plaintiffs' claims should be dismissed because the College functions as an arm of the Tribe. The Tribe has filed an *amicus curiae* brief. The Tribe agrees with the College. Plaintiffs oppose the College's motion. Plaintiffs argue that the College is not an arm of the Tribe.

The Court conducted a hearing on the College's Renewed Motion to Dismiss on February 15, 2018. (Doc. 107). The Court is prepared to rule.

## **DISCUSSION**

Plaintiffs ground their federal claims against the College in the False Claims Act. The False Claim Act permits suits against "any person" who defrauds the government by "knowingly present[ing] . . . a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). The False Claims Act excludes sovereign entities, including federally recognized tribes, from the term person. *Cain*, 862 F.3d at 941. Entities that function as an arm of a tribe are also excluded from the term person for purposes of the False Claims Act. *Id*.

*White* instructs courts to employ a multi-factor analysis to determine whether an entity enjoys sovereign immunity as an arm of the tribe. *White*, 765 F.3d at 1025. The factors include: 1) the method of creation of the entity; 2) the purpose of

the entity; 3) the structure, ownership and management of the entity, including the amount of control the tribe has over the entity; 4) the sovereign's intent with respect to the sharing of its sovereign immunity with the entity; and 5) the financial relationship between the sovereign and the entity. *Id*. Application of these factors to the undisputed facts establishes that the College functions as an arm of the Tribe.

### 1. The Method of Creation of the College

The College sits on tribal land on the Flathead Indian Reservation. *See Smith v. Salish Kootenai College*, 434 F.3d 1127, 1134 (9th Cir. 2006). The Tribal Council chartered and established the College on November 18, 1977, pursuant to its governmental authority under §16 of the Indian Reorganization Act, 25 U.S.C. § 476, and the Tribe's Constitution. (Doc. 92-3 at 2; Doc. 92-3 at 4). The College was incorporated under tribal law as a tribal non-profit corporation. (Doc. 92-3 at 4). The Tribal Council appointed the College's first Board of Directors. (Doc. 92-2 at 2-3; Doc. 92-3 at 2, 9). The College's bylaws state that each of the members of the College's Board of Directors must be enrolled members of the Tribe. (Doc. 92-10 at 7).

The Tribe incorporated the College under Montana law on September, 12, 1978. (Doc. 92-4). The dual incorporation of the College under tribal law and state law does not disqualify the College from functioning as a tribal entity. *See Smith*,

434 F.3d at 1129, 1135; *see also*, *Duke v. Absentee Shawnee Tribe of Oklahoma Housing Authority*, 199 F.3d 1123, 1125 (10th Cir. 1999) (creation of entity "under state law does not preclude its characterization as a tribal organization"). The first *White* factor supports a finding that the College functions as an arm of the Tribe.

### 2. The Purpose of the College

The Tribe established the College pursuant to its intrinsically governmental obligation "to represent, develop, protect and advance the views, interests, resources, and education of its members." (Doc. 92-3 at 2). The Tribe recognized that "there [was] a tremendous need for educational programs beyond high school" and that "many . . . tribal members and their families [were] not able to move to cities where there [were] colleges and vocational schools." *Id*.

The College serves at least three primary purposes. The College seeks to provide post-secondary education opportunities for Native Americans on the Flathead Indian Reservation. (Doc. 92-3 at 4-5). The College seeks to "upgrade the skills and competencies of [tribal] employees." (Doc. 92-3 at 2; Doc. 92-7 at 9). The College also seeks to "assist with the preservation of the cultures, languages and histories" of the Confederated Salish and Kootenai Tribes. *Id*.

Most of the College's students are Native Americans. (Doc. 92-17 at 4). Twenty-seven percent of the College's students are members or descendants of the

Confederated Salish and Kootenai Tribes. (Doc. 92-17 at 4-5). The second *White* factor supports a finding that the College functions as an arm of the Tribe.

### 3. The Structure, Ownership, and Management of the College, Including the Amount of Control Exercised by the Tribe

Deep interconnections exist between the College and the Tribe. The Tribal Council chartered the College. The Tribal Council named the College. The Tribal Council has defined the College's purposes. The Tribal Council has prescribed the College's duties and powers. The Tribal Council possesses the authority to appoint and remove members from the College's Board of Directors. (Doc. 92-10 at 16, 18). The College, in turn, provides services to the Tribe and ensures that the College's curriculum serves the purposes defined by the Tribal Council.

#### a. The College's Governing Board

The College's Board of Directors possess the authority to control day-to-day activities of the College. (Doc. 92-3 at 9). The Tribal Council delegated that day-to-day authority to the College's Board through the College's articles of incorporation. *Id*. The Tribal Council has retained authority over the College's Board. The Tribal Council has reserved the right to review the actions of the College's Board and "prescribe such regulations, provisions and limitations" as the Tribal Council deems appropriate. (Doc. 92-3 at 9).

The Tribally Controlled Colleges and Universities Act (TCCUA), 25 U.S.C. § 1801 requires the Tribal Council's delegation of day-to-day governance authority to the College's Board in order for the College to maintain its status as a "tribally controlled college." A tribally controlled college constitutes an institution of higher education that is formally controlled, or has been formally chartered by the governing body of an Indian tribe. 25 U.S.C. § 1801(a)(4). The College qualifies as a tribally controlled college as the Tribal Council chartered the College and the Tribal Council continues to possess authority over the College. *See Hagen v. Sisseton-Wahpeton Community College*, 205 F.3d 1040, 1043 (8th Cir. 2000) (community college chartered, founded, and controlled by tribe deemed to be a tribal entity).

The Northwest Commission on Colleges and Universities (NWCCU) accredited the College. Accreditation standards mandated by the NWCCU require that the College possess its own governing board and operate with "appropriate autonomy." *See* NWCCU *Accreditation Standards* Std. 2A, 2A23, www.nwccu.org/ accreditation/standards-policies/ standards/. The Tribe and the College carefully preserve this "appropriate autonomy." The College would lose its accreditation, its "tribally controlled college" status, and funding under the

TCCUA, if it failed to operate without the required level of autonomy. *See* 25 U.S.C. § 1804.

Plaintiffs argue that the Tribal Council's lack of control over the day-to-day activities of the College disqualifies the College from functioning as an arm of the Tribe. Plaintiffs offer no legal authority, however, in support of their position. It appears that Plaintiffs' position would risk every accredited tribally controlled college losing its sovereign status by virtue of its compliance with accreditation standards that require appropriate autonomy.

> **b.** **The Tribal Council Treats the College as a Component of the Tribe**

The Tribal Council treats the College as a component of the Tribe. The Tribal Council has advocated for the College at the state and federal levels on issues of importance to the College. (Doc. 92-1 at 25). The Tribal Council has represented to federal agencies that the College operates as a "tribally controlled" entity that should be eligible for funding reserved for tribes. (Doc. 92-1 at 14-15). The federal Office of Personnel Management's recognition of the College as a tribal entity allows employees of the College to obtain federal employee benefits. (Doc. 92-11 at 42-46).

The Tribal Council has assigned important roles to the College that it would not assign to an independent entity, such as operating the tribal library. The Tribal

Council has designated the tribal library as a government depository for tribal documents and artifacts. (Doc. 92-8 at 22). The Tribal Council has granted the College special permits to use tribal land and tribal resources. (Doc. 92-1 at 21-22). The Tribal Council also has authorized and encouraged tribal departments to collaborate with the College on numerous marketing, education, and cultural preservation efforts in which they share common goals. (Doc. 92-1 at 31-41).

### c. The College recognizes its subsidiary relationship with the Tribe

The College recognizes its subsidiary relationship with the Tribe. The College's policies reflect that the College's Board serves at the discretion of the Tribal Council. The College's Board possesses the obligation to "represent the [Tribal Council] in the administration and management" of the College. (Doc. 92-7 at 13). The College's hiring guidelines assign priority to enrolled members of the Tribe and to first generation descendants of the Tribe. (Doc. 92-7 at 19). The College's bylaws require that the College's Board report to the Tribal Council regularly on "pertinent activities of the Board" and on the "progress of . . . [C]ollege program[s]." (Doc. 92-10 at 19). By design and in practice, the College functions as a subsidiary entity of the Tribe while operating with the "appropriate autonomy" required of a post-secondary institution. The third *White* factor supports a finding that the College functions as an arm of the Tribe.

### 4. The Tribe's Intent to Share its Sovereignty with the College

The Tribe has demonstrated its intent to share sovereignty with the College in a number of ways. The Tribal Council chartered and established the College pursuant to its governmental authority under Section 16 of the Indian Reorganization Act. Tribal sovereign immunity may extend to a Section 16 entity that functions "as an arm of the tribe," including a for-profit or non-profit corporation chartered under state or tribal law. *See Allen v. Gold Country Casino*, 464 F.3d 1044, 1046-47 (9th Cir. 2006). The College's articles of incorporation expressly limit the College's power to sue and to be sued to tribal court. (Doc. 92-3 at 5). The Tribe's Court of Appeals has recognized the College as a "tribal entity that is closely associated with and controlled by the Tribe[]." *Smith v. Salish Kootenai College*, AP-99-227-CV (CSKT Ct. of Appeals 2003) (Doc. 92-14 at 11); *see also Smith*, 434 F.3d at 1134. The Tribe also has expressly stated in this lawsuit that the College functions as an arm of the Tribe. The fourth *White* factor supports a finding that the College is an arm of the Tribe.

### 5. The Financial Relationship Between the Tribe and the College

The Tribe and the College interconnect financially in a number of ways. The United States Department of Interior (DOI) provides the College's primary

funding source. The DOI administers congressional appropriations to the College under the TCCUA. (Doc. 93-2 at 11-12). The College would not be eligible for funding under the TCCUA if it were not for the Tribe's charter and ongoing sanction. The Tribal Council frequently applies for funding on behalf of the College and passes the grant funds through to the College. (Doc. 92-1 at 14-15; 93-3 at 1-7).

The Tribal Council has designated the College as a "tribal entity." The tribal entity designation opens the College to eligibility to receive federal funding reserved exclusively for tribes, including TCCUA funds, self-governance compact funds, and vocational education and library service funds set aside for Indian tribes. (Doc. 92-1 at 14, 47; Doc. 92-2 at 214, 327-329, 396, 1201-02, 1715-16).

The Tribal Council has designated the College as eligible to enter into PL 93-638 self-determination contracts. (Doc. 92-1 at 14; Doc. 92-2 at 239-40, 1398-1401, 2816-17). The Tribal Council has appropriated funds in its BIA Self-Governance Compact Budget for the College's use. (Doc. 92-1 at 48; Doc. 92-2 at 715-16, 1765; Doc. 92-18; Doc. 93-4). The Tribe has made financial contributions to the College. (Doc. 92-1 at 49; Doc. 92-17 at 3). The Tribe has leased trust land to the College. (Doc. 92-1 at 53; Doc. 92-20).

Plaintiffs argue that the College has failed to satisfy the fifth *White* factor. Plaintiffs point to the fact that the Tribe avoids liability for any judgment against the College due to the fact the College operates as a corporation with a separate legal status. The College's corporate structure admittedly operates to shield the Tribe's assets from an adverse judgment. A judgment against the College nevertheless would act as a judgment against the Tribe. The Tribe chartered the College to provide post-secondary education on the Flathead Indian Reservation. The College's financial health proves critical to that mission. The judgment would impede the Tribe's efforts to provide post-secondary education on the Reservation. The fifth *White* factor supports a finding that the College qualifies as an arm of the Tribes.

## CONCLUSION

All five *White* factors support a conclusion that the College functions as an arm of the Tribe. The College shares in the Tribe's sovereign immunity given its status as an arm of the Tribe. The College is not subject to suit under the False Claims Act. The Court lacks subject matter jurisdiction over the claims asserted against the College.

Accordingly, IT IS ORDERED:

1. The College's Renewed Motion to Dismiss (Doc. 91) is GRANTED.

2. Plaintiffs' claims against the College are DISMISSED for lack of subject matter jurisdiction.

DATED this 17th day of May, 2018.

Brian Morris
United States District Court Judge